## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:25-cv-1884

AMIR BROWN, an individual,

     Plaintiff,

v.

UNITED AIRLINES, INC,

     Defendant.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiff Amir Brown, through his counsel, Tyrone Glover, Helen Oh, and Genevieve Mesch of TYRONE GLOVER LAW, respectfully alleges for his Complaint and Jury Demand:

### I. INTRODUCTION

1.    Plaintiff Amir Brown is an African-American man, and worked as a Ramp Service Agent for United Airlines, Inc. ("United") at Denver International Airport. Throughout his employment, Mr. Brown was recognized for his excellent performance.

2.    During his tenure with United, Mr. Brown experienced a racially hostile work environment—he was segregated and excluded by his Move team coworkers, was harassed by his Supervisors, and was disproportionately disciplined as compared to his non-Black co-workers.

3.    When Mr. Brown reported his discriminatory treatment, he was retaliated against by his Supervisors who escalated their efforts to discipline him for behaviors which non-Black employees were allowed to engage in, and set him up for termination by denying him sick leave he should have been entitled to and failing to notify him about attendance discrepancies.

4.    This hostile and retaliatory work environment escalated until Mr. Brown was discharged on November 28, 2023.

5.    United's discriminatory discharge of Plaintiff based on his race, its perpetuation of a hostile work environment, and its unlawful retaliation against him after he complained of discriminatory treatment, is a violation of Title VII of the Civil Rights Act of 1964, as amended, ("Title VII"), 42 U.S.C. § 2000e, *et seq.,* the Colorado Anti-Discrimination Act ("CADA"), C.R.S. § 24-34-401, *et seq.*, and the Family Medical Leave Act, 29 U.S.C. § 2601, *et seq.*

## II.    JURISDICTION AND VENUE

6.    This action is brought under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*  Jurisdiction of this Court is invoked under 28 U.S.C. §§ 1331 and 1343.

7.    Jurisdiction supporting Plaintiff's claims for attorney's fees and costs is conferred by 42 U.S.C. §§ 2000e-5(k).

8.    Venue is proper under 28 U.S.C. § 1391 because the employment practices alleged to be unlawful occurred in the District of Colorado.

## III.    ADMINISTRATIVE PREREQUISITES

9.    Plaintiff timely filed a Charge of Discrimination with the Colorado Civil Rights Division ("CCRD") and the U.S. Equal Employment Opportunity Commission ("EEOC"), CCRD Charge No. E2500026287 and EEOC Charge No. 32A-2024-00962, and has received his notice of right to sue.  Thus, all administrative prerequisites have been met.

## IV.    PARTIES

10.    At all relevant times, Mr. Amir Brown was a resident of and domiciled in the State of Colorado and was an employee of United Airlines, Inc. located at the Denver International

Airport. Mr. Brown is an African-American man, and is a member of the class of persons protected by Title VII and CADA.

11.     Defendant United Airlines, Inc. (hereinafter, "United") is an international airline incorporated in Delaware with its corporate headquarters in Chicago, IL, that has been continuously doing business in the State of Colorado.

## V.    STATEMENT OF FACTS[1]

12.     Mr. Brown began his employment with United in March 2017 as a Ramp Service Employee at Newark Liberty International Airport.

13.     In October 2020 he accepted a Ramp Agent position at Denver International Airport (DEN).

14.     In January 2023 he was promoted to a Specialty position on the Aircraft Move Team.

15.     Throughout his tenure with United, Mr. Brown was consistently recognized for his excellent performance and diligence.

16.     Mr. Brown was incredibly hardworking and dependable—frequently working between 70 to 100 hours a week, picking up overtime shifts, and often working 16-hour days back-to-back.

### A. United Perpetuated a Culture of Discrimination at Denver International Airport

17.     During his time as a Ramp Agent at Denver International Airport, Mr. Brown experienced a work environment and culture that enabled racism towards Black employees.

18.     Around November 2020, Mr. Brown learned that a Black employee named Barry Cole had been experiencing severe racism from a group of senior White employees.

---

[1] Facts are alleged upon information and belief, unless stated otherwise.

19.    United ignored preliminary reports of racial hostility, allowing the racism to escalate until an employee referred to as "Fast Eddie" told Barry Cole to "go fetch" a noose from a vending machine near the East breakroom.

20.    After a White supervisor reported the noose incident, United finally terminated Fast Eddie and another White employee who yelled "nigger" in the break room.

21.    However, following the terminations, United concealed the incident instead of addressing the underlying cultural issues that had allowed the racist conduct to escalate. As a result, Mr. Brown observed the workplace environment to become increasingly segregated and hostile for employees of color.

22.    Mr. Brown also experienced differential and unfair treatment from United supervisors.

23.    When Mr. Brown went to Taylor Hieber in October 2022 to request leave for bonding time with his newborn daughter, Ms. Hieber denied his request and insisted that only mothers or management were eligible for bonding time. Thus, Mr. Brown was only allowed twelve days of unpaid leave and was told that he had to draw on his sick time if he wanted to take any additional time off.

24.    Mr. Brown later learned that Union Shop Steward James McDonald, whose daughter was born about three months before his daughter, had been approved to take paid leave for bonding time.

**B.  Mr. Brown was Harassed Based on his Race by United's Move Team**

25.    The discriminatory treatment that Mr. Brown was experiencing escalated when he was promoted to the Aircraft Move Team in January 2023.

26.    While on the Move team, Mr. Brown's primary Supervisor became Ray Warren.

27.    The Move Team at Denver had a separate break room from other United employees and consisted of a small, tight-knit group of specialized employees.

28.    Among the nearly 62 Move Team members, Mr. Brown was one of only two employees of color.

29.    On his second day using the Move Team break room, a White employee who knew that he had completed the training program told Mr. Brown, "You're not supposed to be in here."

30.    From that day forward, Mr. Brown was segregated from, and ignored by, his White colleagues while in the Move Team break room.

31.    When Mr. Brown would greet other employees or say hello, they would frequently refuse to acknowledge him, and everyone would position themselves so that there were no seats left for Mr. Brown, forcing him to sit by himself at the computer.

32.    Outside the Move Team break room, other White Move Team employees refused to partner with Mr. Brown on assignments, so he was sometimes left with nothing to do for hours.

33.    Mr. Brown was also frequently forced to work by himself in the hanger, which was against United rules and was potentially a safety hazard.

34.    Mr. Brown's supervisors observed this behavior and took no action to prevent his segregation and exclusion.

35.    Subsequently, a group of White Move Team employees started submitting false reports about Mr. Brown's performance to supervisor Ray Warren, claiming that he was breaking rules and using his cell phone on the job.

36.    Supervisor Ray Warren confronted Mr. Brown multiple times regarding these allegations, and each time, Mr. Brown had to explain that the reports were untrue and point out that there was no evidence to support the claims.

37.     Mr. Brown also specifically reported to Mr. Warren that he was being segregated in the break room, left to work alone in the hanger, and targeted by his colleagues by false complaints, but Mr. Warren refused to take any action to ameliorate the situation.

38.     This situation was incredibly distressing and isolating for Mr. Brown and was calculated to make his working conditions so intolerable that he'd quit.

39.     Mr. Brown asked his Union shop steward, Daryl, to speak with Mr. Warren to about why he was being treated so poorly by the Move Team.

40.     After speaking with Mr. Warren, Daryl informed Mr. Brown that Mr. Warren did not like him and wanted Mr. Brown to take on fewer overtime assignments. Additionally, Mr. Warren told Daryl that the Move Team employees were upset that Mr. Brown was working too much overtime and therefore earning more than them.

41.     United policy is to allow the employees with the least overtime the first chance to pick up an overtime shift. Because Mr. Brown was one of the top overtime earners other Move Team employees would always have priority to pick up an overtime shift over Mr. Brown. Consequently, Mr. Brown never took away any other Move Team employee's opportunity to pick up an overtime shift if they wanted to earn more money.

42.     Move team employees and Mr. Warren did not express similar sentiments about non-Black employees who were high overtime earners.

43.     It was clear that the real reason the Move team employees and Mr. Warren did not like Mr. Brown, did not want to work with Mr. Brown, and resented Mr. Brown earning more than them, was because of his race.

44.    After receiving confirmation that many members of the Move Team did not want to work with him, Mr. Brown decided to start using the locker room during his breaks to avoid the untenable hostility in the break room.

45.    There was no rule prohibiting employees from using the locker room, and several employees, including a Hispanic Move Team Employee named Jeff Viera, were already using the locker room during breaks.

46.    However, even when Mr. Brown started avoiding the breakroom, his coworkers still found ways to harass and discriminate against him. A White Move Team employee named Salvador berated and swore at Mr. Brown on the airfield. Jeff Viera witnessed one of Salvador's outbursts and reported it to a supervisor, but the Supervisor downplayed the incident, and nothing was ever done.

47.    Next, a White dispatcher named Mike started criticizing Mr. Brown over the radio and scouring surveillance footage during his shifts to find evidence that would support another complaint against him.

48.    Jeff Viera also told Mr. Brown that Mike had referred to him as "the Black guy" on multiple occasions.

49.    Mr. Brown reported this new harassment to Mr. Warren around March or April 2023, but Mr. Warren claimed there was nothing he could do and advised Mr. Brown to report it to Shop Steward Kevin Whitman.

50.    Mr. Brown then reported his treatment to Kevin Whitman and specifically told him that he believed his treatment was discriminatory.

51.    After Mr. Brown reported Mike's racist comments Kevin Whitman, no action was taken.

### C. Mr. Brown was Retaliated Against for Reporting his Harassment

52.    After Mr. Brown reported his harassment to Mr. Warren and Mr. Whitman he began experiencing retaliation from Mr. Warren.

53.    Around April 2023—within a month of his report—Shop Stewards Kevin Whitman and Andrew Larson, along with Mr. Warren, ambushed Mr. Brown in the locker room, saying that an employee had submitted a complaint because they were uncomfortable that Mr. Brown was sitting in the corner of the locker room near their personal locker.

54.    When Mr. Brown explained that he was not comfortable using the break room because he felt targeted and segregated based on his race, Mr. Warren said that while there was no rule explicitly prohibiting use of the locker room, "It'd be better for everyone if you just use the break room."

55.    Jeff Viera witnessed the confrontation in the locker room and volunteered to swap corners with Mr. Brown. Specifically, he said, "Since they are always messing with you, lets swap corners."

56.    After Mr. Viera and Mr. Brown swapped corners, the employee dropped their complaint—demonstrating that the discomfort was based on having a *Black* man near their locker, not just having an employee near their locker.

57.    A few weeks later, Mr. Warren called Mr. Brown in for a meeting to inform him that he had been written up for missing an assignment. Mr. Warren asserted that after dispatch assigned Mr. Brown to a shift, he failed to respond using his company phone, and the dispatcher had been unable to locate him in the break room.

58.    Mr. Warren argued that this situation would not have occurred if Mr. Brown had not been in the locker room and insisted that he needed to use the break room to avoid being written up for missing future assignments.

59.     This missed assignment was staged in order to get Mr. Brown in trouble. Mr. Brown later learned that Mike had been the dispatcher who assigned the last-minute shift, and that he had done so right before clocking out and leaving the airport for the day. While getting ready to leave in the locker room, Mike would have seen Mr. Brown's phone charging in the locker room and known that Mr. Brown was likely using the bathroom. The shift was assigned while Mr. Brown was in the bathroom without his phone, and without enough time for him to return and see the assignment.

60.     During this time no other Move Team employees were told not to use the locker room or disciplined for using the locker room.

**D.  United Manufactured Disciplinary Issues as a Pretext to Terminate Mr. Brown**

61.     Starting the summer of 2023, United's retaliation escalated as they began engineering violations of United policies as a pretext for Mr. Brown's eventual termination.

62.     In June 2023, Mr. Brown broke his nose, resulting in chronic pain, severe migraines, and difficulty sleeping. Mr. Brown also had difficulty breathing, particularly in the heat.

63.     Mr. Brown asked Mr. Warren about taking leave due to his injuries and provided paperwork from his doctors.

64.     Mr. Warren gave Mr. Brown around 5 days where they left him off of the schedule, but after that, Mr. Warren told Mr. Brown that he needed to get back to work and would need to utilize sick time for any additional time off.

65.     Mr. Brown was not placed on FMLA leave.

66.     Under United Policy, employees are not penalized in the attendance point system for using FMLA but are penalized for taking regular sick leave.

67.     Employees generally start with 7 points (although they can earn up to 8). An employee loses 1 point for each Sick Leave absence, 3 points for each No Call No Show, 1 point

for leaving work early with notification from management (but no formal approval), and 3 points for leaving early without notifying management.

68.    Employees face disciplinary consequences for losing attendance points, as shown in the below chart:

| Point Range | Results |
|---|---|
| 7.0 to 4.0 points | Acceptable Attendance |
| 3.5 to 2.5 points | Documented Verbal Warning |
| 2.0 to 1.5 points | Written Warning |
| 1.0 to 0.5 points | Termination Warning |
| 0 points | Termination — Hearing |

69.    Although Mr. Brown was still experiencing significant medical issues as a result of his broken nose, he returned to work rather than take sick leave because he could not afford to lose attendance points and potentially suffer disciplinary consequences.

70.    Shortly after he returned from leave, on June 23rd, Mr. Brown was written up for a no-call no-show because he forgot that he had previously swapped shifts with another employee, largely due to the intense migraines, pain, and sleep deprivation he was still experiencing as a result of his injury.

71.    United penalized Mr. Brown for an unexcused absence and reduced his attendance score.

72.    A few weeks later, on July 24th, United sent Mr. Brown to the hospital via ambulance during his shift after his nose was bleeding and he became nauseous and lost his balance—again due to the lingering effects of his injury.

73.    Even though Mr. Brown had come to work, and it was United that made the decision to send Mr. Brown home, they penalized him for an unexcused absence and reduced his attendance score.

74.     In July 2023, Mr. Brown was pulled over by Airport Operations while driving to the hanger. Although they did not have a speed radar, they said it appeared he had been speeding. He was issued a verbal warning.

75.     Several weeks later, Mr. Warren asked Mr. Brown to meet with him to discuss the incident. When he arrived for the meeting, Shop Steward Andy (White) was also present. During this meeting, Mr. Warren never disclosed to Mr. Brown that he was under investigation and or that he would be subject to disciplinary action.

76.     Mr. Brown was shocked when United issued him a 15-month verbal termination warning a few days later.

77.     When Mr. Brown requested a meeting with a shop steward to discuss the alleged infraction, he was told that he had already consented to using Andy and that the decision to issue the warning had already been made. Given Andy's close personal relationship with Mr. Warren, Mr. Brown would not have done so had he known that he was being investigated for potential discipline.

78.     The termination warning that Mr. Brown received was disproportionate compared to how other employees were disciplined by United.

79.     During this same period, Move Team employee Salvador damaged an aircraft using the Mobile Stairs, hit an employee while operating the bag transfer vehicle, and damaged another piece of Move Team equipment. For all of this conduct, Salvador was only subject to a 15-month termination warning.

80.     Mr. Brown also spoke with another Move team employee who had a speeding infraction, and that employee had not been placed under a termination warning or subjected to disciplinary action.

81.    Mr. Brown had also previously been issued a parking ticket by Airport Operations while working as a Ramp Agent at DEN and was not subject to any disciplinary action.

82.    The contrast in Mr. Brown's discipline is evidence that of the retaliatory and hostile work environment that Mr. Brown was subjected to by Mr. Warren, and the Move team.

83.    After this termination warning, United manufactured additional attendance violations in order to justify Mr. Brown's termination.

84.    Mr. Brown had to take additional unexcused personal absences due to ongoing health issues from his broken nose.

85.    Mr. Brown also received attendance violations for leaving his shift early, despite the fact that his early departure had previously been approved.

86.    Throughout his time at United, Mr. Brown had been permitted to leave his night shifts 30 minutes early so he could catch the last bus of the evening.

87.    Each time he left early, he had to verbally notify dispatch and his supervisor. He was also supposed to submit an electronic exception request to avoid an automatic half-point deduction from his attendance score for clocking out before the end of his scheduled shift.

88.    Prior to working on the Move Team, whenever Mr. Brown forgot to submit the electronic exception request, he was notified by Human Resources or a supervisor and was given an opportunity to submit a request before the half-point was deducted from his attendance score.

89.    During the week of November 16, 2023, Mr. Brown was called into a meeting with Supervisor Ray Warren, Chad Blake, and Taylor Hieber. They told Mr. Brown that over a period of about 17 days, he had forgotten to submit exception requests on 5 occasions, causing his attendance score to fall to negative 6.5.

90.     They said that because he was still under a termination warning from July, Mr. Brown only had a couple of days to fix the issue, otherwise the negative attendance score could be grounds for termination.

91.     Prior to this meeting, Mr. Brown had not received any notifications from Human Resources or a supervisor indicating that he had forgotten to submit an exception request or that he had a poor attendance score—a deviation from the normal practice.

92.     In the past, Mr. Blake had retroactively accepted exception requests on Mr. Brown's behalf on multiple occasions, and on this occasion Mr. Blake assured Mr. Brown that his points would be corrected.

93.     However, when Mr. Brown attended another meeting with Mr. Warren, Mr. Blake and Ms. Hieber a few days later, they told him that United had placed him on paid suspension pending a termination hearing.

94.     When Mr. Brown attended the termination hearing, Ms. Hieber claimed that because he was under a termination warning, his attendance score could no longer be corrected.

95.      Mr. Blake also denied that Mr. Brown had ever been authorized to leave early in the first place. This was blatantly false and contradicted by United's own track record of allowing him to leave early and accepting his exception requests.

96.     Subsequently, on November 28, 2024, United made its decision to terminate Mr. Brown for violating the attendance policy.

**E.  United Failed to Follow Notice and Meeting Requirements when Disciplining Mr. Brown**

97.     United failed to provide Mr. Brown notice and a meeting regarding his attendance score decreasing, which would have given him the opportunity to correct those issues and prevent his termination.

98.     United's practice in the past was always to warn Mr. Brown if he was forgetting to exempt his early departures in the computer system.

99.     United guidelines state that an employee is entitled to a documented verbal warning when they fall to 3.5 to 2.5 points, a written warning when they fall to 2.0 to 1.5 points, a meeting when they hit 1.0 to 0.5 points, and a termination hearing at 0 points.

100.    Although United claims that Mr. Brown was issued a Documented Verbal Warning on September 16, 2023, Mr. Brown never received any such document.

101.    United also claims that on September 29, 2023, Mr. Brown was issued a notice of proposed termination. In reality, Mr. Brown was never given this notice, and he only learned of his Investigatory Review Meeting ("IRM") the week of November 16, 2023.

102.    Between the alleged warning and the IRM, Mr. Brown was cited 4 times for leaving his shift early—despite being approved for an early departure—and was never given a warning that he was accruing points or that he needed to go into the system to enter his exemptions.

103.    It was United's consistent practice to notify and warn employees who forgot to put their exemptions into the computer system for early departures.

104.    While attending meetings with the Union to appeal United's decision, Ms. Hieber ultimately admitted to Mr. Brown that she had failed to notify him regarding the attendance issues and that she had skipped steps that could have prevented his termination.

105.    Ms. Hieber stated that for several weeks Mr. Brown's name had been on the top a list of employees needed to be contacted regarding their attendance score, but that she had not done so.

106.    Despite the acknowledgement of her failure to follow standard practice and policy, United did not take this into consideration and went forward with Mr. Brown's termination.

107.    As a result of his termination, Mr. Brown suffered and continues to suffer substantial injuries and damages, including lost wages and emotional distress and mental anguish.

## STATEMENT OF CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Hostile Work Environment Because of Race and Retaliation**
**Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e,** *et seq.*

108.    Plaintiff incorporates all paragraphs of this Complaint as though fully set forth herein.

109.    Plaintiff, an African American man, is a member of a protected class on the basis of race.

110.    Plaintiff was, and has at all relevant times been, qualified to perform his job responsibilities as a United employee, and performed his job in highly effective manner.

111.    The offensive conduct described in the preceding paragraphs was sufficiently severe or pervasive to alter the terms and conditions of employment for Mr. Brown.

112.    The harassment and hostile work environment to which Mr. Brown was subjected was based on his race and was perpetrated and enabled by managers for United who had actual authority over Mr. Brown.

113.    United knew or should have known of the hostile work environment because United supervisors and managers observed it, because the harassment was frequent and notorious in nature, and because Mr. Brown complained about it to Supervisors on multiple occasions.

114.    United failed to take prompt or effective action to prevent, correct, or remedy the work environment that was hostile for Mr. Brown.

115.    The effect of the practices complained of above has been to deprive Mr. Brown of equal employment opportunities and to adversely affect his status as an employee based on his race.

116.    The unlawful employment practices were intentional and were done with indifference to Mr. Brown's federal protected rights.

117.    As a direct and proximate result of these unlawful employment practices Mr. Brown has been deprived of equal employment opportunities, and suffered humiliation, degradation, emotional distress, other consequential damages, and lost wages.

## SECOND CLAIM FOR RELIEF
### Race Discrimination
### Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*

118.    Plaintiff incorporates all paragraphs of this Complaint as though fully set forth herein.

119.    Plaintiff, an African American man, is a member of a protected class on the basis of race.

120.    Plaintiff was, and has at all relevant times been, qualified to perform his job responsibilities as a United employee, and performed his job in highly effective manner.

121.    Plaintiff was subject to an adverse employment action when United terminated his employment.

122.    United engaged in race discrimination against Plaintiff by treating him less favorably than non-Black employees who engaged in similar conduct.

123.    United engaged in race discrimination against Plaintiff by disproportionately disciplining and investigating him for rule violations, while treating other non-Black employees more favorably.

124.    United engaged in race discrimination against Plaintiff by intentionally causing him to accrue attendance violations, and failing to provide him an opportunity to accrue these violations. United treating other non-Black employees in similar situations more favorably.

125.    Plaintiff's race was the motivating factor in Defendant's taking adverse employment action against Plaintiff.

126.    Defendant's asserted reasons for taking adverse employment action against Plaintiff was mere pretext for illegal discrimination and did not actually motivate such actions.

127.    As a direct and proximate result of these unlawful employment practices Mr. Brown has been deprived of equal employment opportunities, and suffered humiliation, degradation, emotional distress, other consequential damages, and lost wages.

### THIRD CLAIM FOR RELIEF
**Retaliation**
**Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.***

128.    Plaintiff incorporates all allegations in this Complaint as though fully set forth herein.

129.    Plaintiff believed in good faith that United discriminated against him on the basis of his race.

130.    Plaintiff engaged in activities and speech opposing discrimination by reporting the disproportionate discipline that he was receiving as discriminatory, and reporting that the hostile work environment on the Move Team and the treatment perpetrated by Mr. Warren was based on his race.

131.    Because of Plaintiff's opposition to his discriminatory treatment, Defendant subjected him to materially adverse treatment by intentionally putting him in a position to lose attendance points, disproportionately disciplining him, and eventually discharging him.

132.     Defendant engaged in unlawful retaliation against Plaintiff pursuant to its custom, policy, or practice to take materially adverse actions against employees who voiced opposition to discrimination or harassment based on race.

133.     Defendant's retaliation against Plaintiff arose out of, was caused by, and was like and related to the race discrimination Plaintiff opposed.

134.     Defendant's retaliation against Plaintiff was the direct and proximate cause of Plaintiff's injuries, damages, and losses.

## FOURTH CLAIM FOR RELIEF
### Hostile Work Environment Based on Race and Retaliation
### Colorado Anti-Discrimination Act, C.R.S. § 24-34-402.

1.     Plaintiff incorporates all paragraphs of this Complaint as though fully set forth herein.

2.     Plaintiff, an African American man, is a member of a protected class on the basis of race.

3.     Plaintiff was, and has at all relevant times been, qualified to perform his job responsibilities as a United employee, and performed his job in highly effective manner.

4.     The offensive conduct described in the preceding paragraphs was sufficiently severe or pervasive to alter the terms and conditions of employment for Mr. Brown.

5.     The harassment and hostile work environment to which Mr. Brown was subjected was based on his race and was perpetrated and enabled by managers for United who had actual authority over Mr. Brown.

6.     United knew or should have known of the hostile work environment because United supervisors and managers observed it, because the harassment was frequent and notorious in nature, and because Mr. Brown complained about it to Supervisors on multiple occasions.

18

7.      United failed to take prompt or effective action to prevent, correct, or remedy the work environment that was hostile for Mr. Brown.

8.      The effect of the practices complained of above has been to deprive Mr. Brown of equal employment opportunities and to adversely affect his status as an employee based on his race.

9.      The unlawful employment practices were intentional and were done with indifference to Mr. Brown's federal protected rights.

10.     As a direct and proximate result of these unlawful employment practices Mr. Brown has been deprived of equal employment opportunities, and suffered humiliation, degradation, emotional distress, other consequential damages, and lost wages.

## FIFTH CLAIM FOR RELIEF
### Race Discrimination
### Colorado Anti-Discrimination Act, C.R.S. § 24-34-402.

1.      Plaintiff incorporates all paragraphs of this Complaint as though fully set forth herein.

2.      Plaintiff, an African American man, is a member of a protected class on the basis of race.

3.      Plaintiff was, and has at all relevant times been, qualified to perform his job responsibilities as a United employee, and performed his job in highly effective manner.

4.      Plaintiff was subject to an adverse employment action when United terminated his employment.

5.      United engaged in race discrimination against Plaintiff by treating him less favorably than non-Black employees who engaged in similar conduct.

6.    United engaged in race discrimination against Plaintiff by disproportionately disciplining and investigating him for rule violations, while treating other non-Black employees more favorably.

7.    United engaged in race discrimination against Plaintiff by intentionally causing him to accrue attendance violations, and failing to provide him an opportunity to accrue these violations. United treating other non-Black employees in similar situations more favorably.

8.    Plaintiff's race was the motivating factor in Defendant's taking adverse employment action against Plaintiff.

9.    Defendant's asserted reasons for taking adverse employment action against Plaintiff was mere pretext for illegal discrimination and did not actually motivate such actions.

10.    As a direct and proximate result of these unlawful employment practices Mr. Brown has been deprived of equal employment opportunities, and suffered humiliation, degradation, emotional distress, other consequential damages, and lost wages.

### SIXTH CLAIM FOR RELIEF
### Retaliation
### Colorado Anti-Discrimination Act, C.R.S. § 24-34-402.

1.    Plaintiff incorporates all allegations in this Complaint as though fully set forth herein.

2.    Plaintiff believed in good faith that United discriminated against him on the basis of his race.

3.    Plaintiff engaged in activities and speech opposing discrimination by reporting the disproportionate discipline that he was receiving as discriminatory, and reporting that the hostile work environment on the Move Team and the treatment perpetrated by Mr. Warren was based on his race.

4.    Because of Plaintiff's opposition to his discriminatory treatment, Defendant subjected him to materially adverse treatment by intentionally putting him in a position to lose attendance points, disproportionately disciplining him, and eventually discharging him.

5.    Defendant engaged in unlawful retaliation against Plaintiff pursuant to its custom, policy, or practice to take materially adverse actions against employees who voiced opposition to discrimination or harassment based on race.

6.    Defendant's retaliation against Plaintiff arose out of, was caused by, and was like and related to the race discrimination Plaintiff opposed.

7.    Defendant's retaliation against Plaintiff was the direct and proximate cause of Plaintiff's injuries, damages, and losses.

## VII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests this Court enter judgment in his favor and against Defendant, and award him all relief as allowed by law, including, but not limited to:

a.    Declaratory relief and injunctive relief, as appropriate;

b.    Actual economic damages, including, but not limited to, front pay and back pay damages, as established at trial;

c.    Compensatory damages, including, but not limited to those for future pecuniary and non-pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses;

d.    An award of punitive damages because Defendant engaged in intentional discrimination and has so done with malice or reckless indifference to Plaintiff's federally protected rights;

e.    Pre-judgment and post-judgment interest at the highest lawful rate;

f.   Attorney's fees and costs; and

g.   Such further relief as justice requires.

**PLAINTIFF AMIR BROWN HEREBY DEMANDS TRIAL BY JURY PURUSANT**

**TO FEDERAL RULE OF CIVIL PROCEDURE 38(b) ON ALL ISSUES SO TRIABLE.**

Respectfully submitted this 16th day of June 2025.

TYRONE GLOVER LAW, LLC

*s/ A. Tyrone Glover*
A. Tyrone Glover
Helen Oh
Genevieve Mesch
2590 Walnut Street
Denver, CO 80205
303-577-1655
tyrone@tyroneglover.com
helen@tyroneglover.com
genevieve@tyroneglover.com

*Attorneys for Plaintiff*